Alex INGRAM, Jr.,
Appellee/Cross–Appellant,

v.

MISSOURI PACIFIC RAILROAD CO.,
Appellant/Cross–Appellee.

Nos. 89–1044, 89–1096.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1989.

Decided March 12, 1990.

Rehearing and Rehearing En Banc
Denied April 20, 1990.

Michael S. Moore, Little Rock, Ark., for appellee/cross-appellant.

Ralph Washington, Little Rock, Ark., for appellant/cross-appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Missouri Pacific Railroad (the "Railroad") appeals from the district court's[1] findings of discrimination in its promotion practices with respect to Alex Ingram and its later retaliatory dismissal of Ingram in violation of Title VII. Ingram cross-appeals the district court's award of reinstatement with back pay at a promoted rate with only the opportunity to again apply for another promotion. We affirm the district court's findings with a modification of the award to Ingram, giving him the next available promotion.

## I. BACKGROUND

Alex Ingram, a black man, began working for the Railroad in 1976 as a switchman-brakeman. He has also been an engineer and a fireman with the Railroad. Ingram first sought advancement into management in 1983 when he contacted Mr. Huffman, his immediate supervisor, expressing his interests in advancement into management. Huffman instructed Ingram to send him a letter in that regard. Apparently a nod by Huffman to higher management would have been instrumental in getting Ingram an interview, but several written and verbal inquiries by Ingram to Huffman led to nothing.

What precise methods of promoting employees were used by the Railroad is not entirely clear. The district court's characterization of the whole business as something of an old boys' network wherein some people are "picked" for promotion over others without any general notice and wherein some people are excluded from any information about the network, however, seems accurate. The Railroad conceded in the testimony of R.D. Lang that a "rumor mill" was all that provided employees with information about promotions. Transcript at 16. Certainly Ingram was never given much of anything in the way of useful information with respect to how to be considered for promotions or when

1. The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

and where positions were available. He was unknowingly outside "the loop," and his superiors seem to have been disposed to keep him there. Thus, in December 1984 Ingram next wrote to Mr. Roach, a division superintendent with the Railroad, about his interest in promotion. Roach arranged an interview for Ingram with Mr. Hart, district manager of personnel.

Hart conducted his interview with Ingram on January 29, 1985. The two men discussed Ingram's interest in a management promotion, and Hart filled out an evaluation form which rated the interviewee from 1 to 5 (1 being the best rating, 5 the lowest) in various categories like communication, career goals, and potential. Ingram later filled out a standard personnel form which asked questions about his education, work experience, and goals, which he returned to Hart. On this form, Ingram indicated a willingness to relocate, travel, and work long hours as required if promoted. During the oral portion of the interview, however, Hart got the impression that Ingram wanted to stay in the area and would not travel or work long hours. In his assessment of Ingram, Hart gave him all 3s and 4s. His remarks about Ingram conclude, "[t]his is a very pleasant man who states he would like to be in 'management' due to the problems he has with his knee and arthritis. He was not aware of the requirements concerning travel and long hours associated with [an] officer's job." The bottommost portion of the form reflects a box checked "not recommended." Plaintiff's Exhibit No. 10, Appellee's Appendix at 8.

In essence, "not recommended" meant that Ingram's promotion chances were dead. He was never again considered for a promotion. Ingram, however, was not apprised of the negative recommendation from Hart and did not know at the time that his chances were all but foreclosed.[2]

In August 1985 two white employees were promoted past Ingram, and he went to Hart asking why he was not promoted.

Despite the fact that Hart had not recommended Ingram and Hart knew that that had all but foreclosed the likelihood of consideration of Ingram, Hart told Ingram only that sometimes people get passed up. Hart instructed Ingram to fill out another form to continue in his promotion efforts. The form was a Request for Transfer Form which would have waived Ingram's seniority in his craft. Ingram declined to fill it out. Ingram suspected he was being discriminatorily denied access to management positions, and he filed an EEOC charge dated December 5, 1985.

Ingram amended that charge with one in July 1986 in which he complained of being subjected to a physical examination after three work absences in 1986. He also complained of dismissal in May of 1986 for missing a work call. The Railroad, however, reinstated Ingram without loss of seniority or benefits (but without backpay) in September after an appeal of the dismissal by his union.

Ingram had a 10% disability in his left knee stemming from military service. He was treated for the disability by the Veterans Administration because it was service related. Surgery had been recommended to him by VA physicians, but Ingram did not want to have it done. In January 1987 Ingram's bad knee swelled from the use of an exercise machine. He consulted a VA doctor on February 9, 1987, at which time medication was prescribed and Ingram was told to return on February 23.

On February 19, 1987, a Thursday, Ingram bumped his bad knee against an engine brake handle while turning in a chair at work. He did not believe that incident was too serious, and he did not report the injury. He took the next day off due to a head cold. On Sunday night, Ingram believed the bump from Thursday was a serious matter after all, as it probably had aggravated his preexisting injury. He went in to see his VA doctor as already scheduled on Monday the 23rd, despite the

**2.** To the contrary, Ingram received a letter from the Railroad's home office in Omaha in February 1985 acknowledging receipt of his application which had been forwarded by Hart, but advising him that no promotion would be forthcoming. The letter indicated that his application would be kept on reserve and wished him the best in his endeavors.

fact that he earlier had entertained notions of not going because he had believed his knee was getting better. That Monday the doctor determined that surgery would be the best alternative to avoid continued aggravation of the original military injury (as had occurred when Ingram bumped into the brake handle).[3] Ingram concluded he had better report the injury and did so the evening of February 23rd by filling out a standard injury report form and leaving it in a time slip box. Ingram testified that he had used the time slip box for many communications with the Railroad and that he did not believe he was required to do more to bring the injury report to the Railroad's attention.

The Railroad felt otherwise and charged Ingram with filing a late and false injury report and conducted two formal investigation hearings on the charges in April 1987. Recommendations of 15 and 30 day suspensions, as well as one of dismissal, were made on the charges. The dismissal recommendation was followed, and Ingram's employment with the Railroad was ended on April 29, 1987.

As a result, he filed another EEOC charge and this lawsuit. The lawsuit alleged discrimination in his evaluation, promotion consideration, requirement of a physical, the 30–day suspension he had received in 1986, and in his ultimate dismissal from the Railroad, all in violation of Title VII. A bench trial was held in June 1988.

Those are the mostly unadorned facts of this case. At trial, the district court credited Ingram's account of his knee injury and report thereof, and it found that the Railroad had used the entire incident as a pretext to fire Ingram—treating his injury report differently than it had another. The court believed Ingram acted reasonably by making his report several days after the actual injury. Our reading of the trial record leaves us satisfied that the court properly credited Ingram's account of his injury and report. This was largely a cred-

ibility determination which Ingram won, and we are loathe to disturb it.

The district court's findings with respect to Ingram's injury were also made in part on the basis of evidence specially introduced after the close of the case. The district court allowed Ingram to reopen his case to introduce evidence of an injury report by a white former Railroad employee, which report the white employee was later allowed to rescind without reprimand. In short, this new evidence was to demonstrate that the Railroad had investigated Ingram's case rather closely as compared to how it had investigated the former employee who had a worse employment record than Ingram. We have more to say about this evidence in our discussion below.

In its order of judgment, the district court concluded that Ingram had not been discriminated against by the requirement of the physical examination or in the 30–day suspension he had received in 1986. The court did find that he had been discriminatorily evaluated and denied promotion, and that his dismissal in April 1987 was in retaliation for his filing of EEOC charges. The court awarded Ingram reinstatement at a promoted rate of pay subject to the outcome of nondiscriminatory consideration of him for an actual promotion. We come back to these findings as necessary in our discussion of the law of the case. We consider the points for reversal first of the Railroad, then of Ingram.

## II. DISCUSSION

### A. Scope of Review

The district court made only oral findings and then entered a three-page judgment in this case. The Railroad suggests that our review of the findings might be something more scrutinizing than by the clearly erroneous standard, either because the oral findings of the district court are not sufficiently detailed or because the district court improperly substituted its judgment

---

**3.** Surgery was performed in March of 1987. Although the VA initially made a claim on the Railroad for reimbursement due to the possibility of injury sustained at work, no monies were ever paid by the Railroad. The VA apparently dropped its claim because the surgery was required due to Ingram's service-related injury.

for the judgment of the Railroad. Neither of those points is persuasive.

■ First, the district court's findings, although oral, are complete and provide enough specific material with which to determine whether or not they are clearly erroneous, the applicable standard. *See Jackson v. Missouri Pacific Railroad Co.*, 803 F.2d 401, 403–04 (8th Cir.1986). The colloquy between the court and counsel makes it clear what view the court took of the evidence, and why. The district court noted that written findings might be more appropriate in this case, but that is no suggestion that its oral findings are any less reliable. In fact, the district court's comment demonstrates that it took care in its oral findings because they were all it had time to make. Any suggestion to the contrary is not well taken by this court.

■ Second, although the Railroad argues in several places that the district court improperly substituted its judgment for the Railroad's, we dismiss that notion altogether. We do not believe the district court did so at all. Rather, the court simply concluded that the Railroad's judgment was flawed as racially discriminatory in its evaluation, failure to promote, and dismissal of Ingram. Actually, whether or not the district court improperly substituted its own judgment for the judgment of the Railroad in this case is really just another way of asking if the district court's findings were clearly erroneous. *See Danzl v. North St. Paul–Maplewood–Oakdale Ind. Sch. Dist.*, 706 F.2d 813, 817 (8th Cir.1983) (finding of district court on pretext of school district for failure to hire woman candidate was clearly erroneous as unsupported by the record). The district court concluded that the Railroad's judgments about Ingram were flawed as racially discriminatory and that the Railroad's given reasons for its actions were pretextual.

We review those findings under the clearly erroneous standard. There is enough record evidence to support the district court's conclusion, and it cannot be said that the district court substituted its judgment for that of the Railroad.

**B. Discrimination Under Title VII**

Title VII has two principal sections prohibiting discriminatory employment practices: 42 U.S.C. § 2000e–2(a) (1982) on discriminatory employment decisions, § 703(a)(1), and 42 U.S.C. § 2000e–3(a) (1982) on retaliatory employment decisions, § 704(a). This case involves both sections in its findings of discrimination: one in evaluation and promotion of Ingram under § 703(a)(1) and one in retaliatory dismissal of Ingram under § 704(a).

While the district court did not characterize the action as either one of mixed-motives or one of pretext, we find it to be one of pretext and use the standards from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There the Court set out the evidentiary burdens of the parties in Title VII cases.[4] First, the plaintiff comes forward with evidence of discrimination, then the defendant may respond with legitimate reasons for its actions, and finally the plaintiff may demonstrate pretext. The ultimate burden to show discrimination in pretext cases is always on the plaintiff.

For our review, we note that we need not parse the evidence into neat piles to determine if each step of *McDonnell Douglas* was met. Rather we may look to the ultimate fact question of discrimination. *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, 1057 (8th Cir.1988); *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir.1985). We have "stud[ied] the record with a view to determining whether the evidence is sufficient to support ... the finding[s] ...

---

4. Despite the Railroad's suggestion, the recent case of *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), does not resolve this case, because *Price Waterhouse* involved mixed-motive sex discrimination and did not disturb the unanimous pronouncement of the Court in *McDonnell Douglas*, a pretext case. *See id.* at 1795 (White, J., concurring). Although the Railroad correctly points out that *Price Waterhouse* has supplanted *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) on the liability burden in mixed-motive cases, that has no bearing on our decision as to liability in this case. *See Gray v. University of Arkansas at Fayetteville*, 883 F.2d 1394, 1401 n. 3 (8th Cir. 1989).

made at trial." *Barber v. American Airlines, Inc.,* 791 F.2d 658, 660 (8th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986). Ingram has carried the final burden in this case, and the evidence is sufficient to support the district court's findings.

### 1. Ingram's Evaluation and Promotion Denial

■ The Railroad's alleged nondiscriminatory reasons for its decision not to recommend or promote Ingram are pretextual. The reasons given for Ingram's negative evaluation (unwillingness to travel, relocate, or work long hours) are contradicted by his written application. Further, Hart's ranking of Ingram as a 3 or 4 in all the categories on the evaluation form seems skewed to the negative side in light of his college education, railroad experience, and interest in management. Hart's conclusion on the form suggests that Ingram only wanted a promotion because the work would be easier than his job as a fireman—a somewhat derogatory characterization of Ingram's interest in a promotion. Again, Ingram's written application (which was apparently not reviewed at all by Hart despite his request that Ingram complete it) suggests the opposite of Hart's view and was credited by the district court.

The record leaves little doubt but that some other factor was operating in Hart's mind which resulted in a negative recommendation for Ingram. We agree with the district court that the other factor was racial discrimination violative of Title VII. The district court's finding, while focusing on Hart's interview with Ingram, was "on the basis of the entire record." Excerpted Findings at 82. The record includes evidence that the Railroad's promotion track was something of an old boys' network which few to no blacks had entered, that Ingram had been given the run-around to begin with, and that Ingram was not given

any indication why white employees were promoted past him or how he could gain a promotion. The finding of discrimination is not clearly erroneous.

### 2. Retaliatory Dismissal of Ingram

Similarly, the evidence surrounding Ingram's injury report and the subsequent investigation of him suggest that the Railroad was going out of its way to create a pretext to fire him. The district court's conclusion on this point is based in large measure on a comparison to the circumstances of an injury report filed by a white former employee of the Railroad, but as with the finding on promotion denial, we believe the whole record supports the finding. The district court was apparently inclined to this finding before the evidence was reopened; nevertheless, we begin with a look at that particular evidence.

■ After the evidence in this case was closed and during argument by counsel before the district court, Ingram came across a document which he showed to his attorney reflecting that Mr. Frawley, a white former employee, had been allowed to rescind an injury report he had filed. Mr. Ingram's attorney asked the court's indulgence to hear what the document was and to reopen the evidence to admit it, as it was evidence of how the Railroad had treated another employee who falsified an injury report—as the Railroad alleged Ingram had done. The court took the matter under advisement directing that the Railroad be given a chance to verify the document and present witnesses on it if necessary. Ultimately the document came in and became part of the record.[5]

The short of Frawley's case, which occurred in the early 80's (he is now deceased), is that he one day noticed some back pain and could not attribute it to anything he had done away from work. He suspected the injury, if any, occurred at

---

5. We do not agree with the Railroad that the district court abused its discretion in allowing the evidence to be opened for the admission of the Frawley letter or in disallowing the evidence to be opened again for the Railroad to present further rebuttal evidence. The Railroad knew

what the purposes of the Frawley evidence would be if used by Ingram, and it had nearly three months to prepare a response. It is disingenuous for the Railroad to claim surprise at the court's use of the evidence. There was no abuse of discretion by the district court.

work but was not certain. He reported this to a supervisor who instructed him to file an injury report. Later he was told that the frequent filing of injury reports created a bad image of an employee. He was given an opportunity to rescind the report by letter, which was the evidence admitted after reopening in this case.[6]

The district court found that the Railroad's treatment of Ingram compared to its treatment of Frawley was evidence of discrimination and retaliatory dismissal. While the two cases are not identical, as the Railroad argues, we do not think that their differences belie the fact that in Frawley's instance the Railroad worked with him nearly as an advocate and in Ingram's instance the Railroad quickly took an adversarial position which put Ingram out of work. Both Ingram and Frawley filed injury reports after a possible on-the-job injury. Ingram did so on his own, Frawley after being told to do so by his supervisor. The Railroad argues against itself when it suggests that Frawley's case is different because his supervisor told him to file a report. The fact that Frawley was shepherded through an injury problem while Ingram was left to his own attempts to address his injury problem is precisely what makes the Railroad look discriminatory.

We do not put as much significance on the Frawley evidence as the district court did. Nevertheless we are confident that that court's reliance on the evidence was correct. Based on all the evidence, which includes Hart's discriminatory evaluation of Ingram, the intangible promotion methods of the Railroad, the intensity with which the Railroad investigated what was something of a routine injury report, and its selection of the harshest reprisal for Ingram, despite his otherwise good employment record, we agree with the district court that Ingram was dismissed in retaliation for his EEOC filings. That finding was not clearly erroneous.

## C. Ingram's Cross–Appeal

Ingram appeals from the district court's award of reinstatement with pay at a promoted rate. He argues instead that, under the facts of this case and the law, he deserves a promotion. We agree.

While the type of relief to be fashioned is committed to the sound discretion of the trial court, we recognize the need to modify relief that has been granted in order to give the plaintiff the fullest relief possible. *See King v. Staley*, 849 F.2d 1143, 1144 (8th Cir.1988) (quoting *Briseno v. Central Technical Community College Area*, 739 F.2d 344, 347 (8th Cir. 1984)). We believe the district court should have awarded Ingram a promotion as soon as reasonably possible.

It was not just an opportunity to compete for a promotion which was denied Ingram as the district court suggests. Excerpted Argument and Findings at 4, 23. A recommendation by Hart would, in all likelihood, have resulted in a promotion for Ingram. The discrimination he suffered by Hart's negative evaluation and failure to recommend was not just the denial of an opportunity, but of a promotion itself. Ingram gains almost nothing if he is only given an opportunity to compete for the next promotion. Though we are confident that the Railroad will not again discriminate against him (or other employees) in its evaluation and promotion techniques in light of the district court's judgment, we are also confident that Ingram deserves the promotion for which he was never fairly considered. Title VII relief is designed to be "make whole" relief, that is, it should put the plaintiff in as good a position as if the discrimination never occurred. A mere opportunity to again compete will not make up for the time Ingram has lost to discrimination—it cannot alone make him whole.

We have consistently felt that employees who have been denied promotions due to illegal conduct require more than just compensatory damages in order to be made whole. We have not been hesitant to

---

**6.** Curiously enough, any actual injury report filed by Frawley was never found. The Frawley letter is all the evidence found on the question.

Obviously an injury report must have been extant at some point in time, however, or Frawley would not have written a letter to rescind it.

award retroactive promotions where appropriate, *see Maney v. Brinkley Waterworks*, 802 F.2d 1073, 1076 (8th Cir.1986); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 574 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983), and are not hesitant to do so here. Retroactive promotion is available only when an "employer fail[s] to show, by a preponderance of the evidence, that the employee would not have been promoted even in the absence of discrimination." *Maney* at 1076 (citing *Bibbs v. Block*, 778 F.2d 1318, 1319 (8th Cir.1985) (en banc)).[7] Because the Railroad's given reasons for its employment decisions concerning Ingram are pretextual, it cannot meet its burden to avoid affirmative relief prescribed by *Maney* and *Bibbs*.

We believe that if Ingram had been fairly considered when he first sought promotion, he would have received one. Our careful review of the record reveals no indication that Ingram is not qualified for the promoted positions he sought with the Railroad. He holds a college degree, possesses more than ample work experience, and has a good work record. Although Ingram expressed an interest in pastoring a congregation, there is no indication that his duty to the Railroad as a manager would be compromised. He has repeatedly expressed the ability and desire to do what is required of him as a manager. But for the Railroad's discriminatory conduct he would have been fairly evaluated and promoted.

What precise title Ingram will get depends on what position first becomes available. Apparently the Railroad's reorganization makes every employee at a certain level a manager. It is that level to which Ingram must be promoted—presumably as a roadmaster or a trainmaster.

An award of promotion here is consistent with the policy and purposes underlying Title VII—that each of us be allowed to ascend in employment according to ability and talent without regard to race, color, religion, sex, or national origin. Alex Ingram was not afforded that chance once. While nothing can remedy the full impact that discrimination will have had on his life, the Congress by Title VII has provided for the remedy we award in this case.

## III. CONCLUSION

We affirm the district court's findings on discriminatory evaluation, promotion denial, and retaliatory dismissal of Ingram with instructions to modify its award to him to require that he receive the first available promotion.

---

7. While *Bibbs* has been, to some extent, abrogated by *Price Waterhouse*, *see* note 4, *supra*, we think *Bibbs* still controls this circuit with respect to the award of promotions. It is unnecessary to comment any further on *Price Waterhouse* for purposes of this case. Whatever it does to Eighth Circuit law, *Price Waterhouse* does nothing for the Railroad in this case. The finding of pretext in the Railroad's employment decisions precludes a finding on this record that it would have made the same decisions even in the absence of discrimination.