Steven P. LINDSEY, Plaintiff,

v.

BAXTER HEALTHCARE
CORPORATION,
Defendant.

No. 88 C 10395.

United States District Court,
N.D. Illinois, E.D.

Jan. 14, 1991.

Leigh R. Gignilliat, Gignilliat & Hymen, P.C., Northbrook, Ill., for plaintiff.

Mark L. Shapiro, Robert S. Letchinger, Rudnick & Wolfe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Steven Lindsey ("Lindsey") sues his former employer Baxter Healthcare Corporation ("Baxter"), charging it with (1) violation of the Age Discrimination in Employment Act of 1967 ("ADEA," 29 U.S.C. §§ 621–634) by passing him over for a promotion and later terminating his employment and (2) breach of his employment contract by treating actual compensation as severance pay. Baxter now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56 on all of Lindsey's claims. For the reasons stated in this memorandum opinion and order, this Court grants Baxter's motion as to the ADEA claim but denies it as to the contract claim.

As to the latter claim, however, even though Lindsey had not filed a cross-motion for summary judgment, the facts submitted by the parties on Baxter's Rule 56 motion are such as to call for a ruling in Lindsey's favor as a matter of law. Judgment is therefore ordered to be entered in favor of Lindsey and against Baxter on that claim.

### Facts [1]

In September 1977 Lindsey was hired at age 31 by American Hospital Supply Corpo-

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a

ration (which was acquired by Baxter in 1985)[2] as a Sales Representative for its Pharmaseal Surgical Products group ("Pharmaseal Surgical").[3] Lindsey continued in that position until September 1982, when he was appointed Region Manager[4] for Pharmaseal Surgical's Washington, D.C. office.[5]

*Performance*

When Lindsey took over the Washington office as Region Manager, it had one of the poorest performance records in Pharmaseal Surgical. Lindsey's performance as Region Manager was indisputably excellent. He was named "Region Manager of the Year" in 1983 and 1984, and his region was ranked first out of nine regions in both those years. In 1986 his region finished fifth nationally out of the 27 regions in the Pharmaseal operating group. In each of the four years that Lindsey was a Region Manager, his performance was rated "Outstanding" (or "Outstanding +"), a rating described in his way on Baxter's performance evaluation forms (Lindsey Aff.Ex. 2 at 2):

> This is a rating that best describes a level of accomplishment that goes well beyond reasonable but demanding standards of performance especially in the key critical areas of major responsibilities. The individual consistently demonstrates truly outstanding achievements in terms of quality and quantity of out-

put. As an overall rating this level of performance should describe those who number among the best.[6]

Specific comments on Lindsey's performance evaluations support such a description. For example, Area Manager John Bardis ("Bardis") reviewed Lindsey in his October 1985 annual evaluation (*id.* Ex. 4 at 2):

> Steve Lindsey has performed in an outstanding manner throughout 1985. His contributions have gone beyond his Region as he significantly impacted the Area and Zone as well.... Additionally, Steve's intense interest in his sales representatives enabled him to gain their respect, support, and excellent sales and profitability results.

In the following year Area Manager Kevin Gould ("Gould") summed up Lindsey's performance (*id.* Ex. 5 at 5):

> Finally, Steve has gone beyond the call of duty during our most recent (6/86) reorganization. His attitude has been great. His results have continued to be tremendous, and he does what ever is necessary to get the job done. Steve Lindsey is one of the top region managers in the country for American Pharmaseal.

Gould therefore recommended (*id.* at 4):

> Steve has the ability to assume a position like Area Manager or others with similar

---

genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Lindsey (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). To arrive at the just-stated ruling adverse to Baxter on Lindsey's contract claim, however, this Court has of course drawn any necessary factual inferences in that respect in the opposite direction.

2. For simplicity's sake, all references to Lindsey's employer in this opinion will speak of "Baxter" rather than differentiating between preacquisition and postacquisition conduct.

3. Pharmaseal Surgical and the Pharmaseal Nursing Products group together made up the Pharmaseal divisions (collectively "Pharmaseal").

4. During the period of Lindsey's employment, Baxter divided its sales territories into various regions, each having six to 11 Sales Representatives. Several regions would in turn make up a larger territory known as an "area," and finally a number of areas were combined into an even larger territory known as a "zone." Region Manager was an entry level management position, and the position of Area Manager was the next step up the corporate management ladder.

5. Hereafter Washington, D.C. will be referred to simply as "Washington" (there is no potential here for confusion with the State of Washington or any other geographical unit bearing our first President's name).

6. [Footnote by this Court] There was just one higher rating: "Distinguished," described in part in this manner on the evaluation form:

> Performance of this caliber is extremely rare.

responsibility within the corporation immediately.

Lindsey has also tendered six letters (*d* Ex. 8) from Bardis and Vice President Joe Kletzel ("Kletzel") to Lindsey during the 1985 and early 1986 period, each commending him on his excellent performance.

Not all comments on the evaluation forms were equally glowing, however. Lack of sensitivity and failure to communicate clearly with superiors were themes running throughout the evaluations. Bardis wrote in a June 1985 quarterly review (Bardis Aff.Ex. 2 at 2) (emphasis in original):

> *Attitude:* Steve, I believe you demonstrate a fairly good attitude to your representatives. However, overall this is an area where I have the most concern for you. There have been occasions during the past five months where your disagreements with the way things were done within the company, were not presented appropriately. This has brought on some negative feedback from upper level managers as well as others in the organization. *This can change.* However, in order to do this, I suggest that you carefully plan your approach before you respond. Additionally, you must make a strong effort to remove your name from the "perceived" gossip mill within the organization. I am committed to supporting your efforts here— but they must be your efforts.

Then Bardis said in his October 1985 annual evaluation (Lindsey Aff.Ex. 4 at 2, 3 [7]):

> Steve has errored [sic] by not appropriately communicating upline and across within Pharmaseal. By using common sense and good manners, this can be overcome.
>
> \*     \*     \*     \*     \*     \*
>
> Steve has a tendency to be abrupt and occasionally curt when communicating. This has hindered him in being con-

sidered for additional leadership and management responsibility.

Gould similarly observed in his October 1986 annual evaluation (*id.* Ex. 5 at 3) that Lindsey:

> —Needs to communicate to top managers more effectively so that they do not get the wrong impression of Steve Lindsey.
>
> —Needs to be careful of sarcastic comments to groups or individuals, especially if they do not know him.

Two incidents in particular are said to have concerned Lindsey's superiors. First, in late 1984 an embarrassing situation erupted when Baxter's decision to terminate a certain Region Manager was prematurely disclosed to that manager. Baxter suspects that Lindsey leaked the information to his subordinates, although when the episode was brought to his attention Lindsey denied knowledge of any such management change. Second, in 1985 Lindsey referred to a Baxter vice president as a "bitch" and berated her performance in front of a group of non-employees. Lindsey acknowledges the incident but explains that he apologized to her in a professional manner and that she accepted the apology in the same fashion.

*Non–Promotion and Termination*

Baxter carried out a series of intra-company reorganizations culminating in the formation of the Operating Room Division ("ORD") in December 1986. ORD was the combination of five divisions: Pharmaseal Surgical, Pharmaseal Nursing Products, Convertors, V. Mueller and NDM. ORD was divided into three "zones," each zone headed by a Vice President/Zone Manager who was responsible for choosing the "area" and "region" managers within his zone in conjunction with ORD Vice President of Sales Kletzel, ORD President David Nelson ("Nelson") and ORD Vice President

---

**7.** Some of the relevant documents showed up in both sides' submissions (for example, Lindsey Aff.Ex. 4 is the same October 1985 evaluation by Bardis that was submitted as Bardis Aff.Ex. 3). When this Court conducts a trial, it insists that such duplication be avoided—after all, juries are regularly instructed that they may consider all

testimony (regardless of who may have called any witness) and all exhibits (regardless of who may have introduced them). To avoid confusion, this opinion has sought to be consistent by referring to each exhibit in the same way throughout the discussion.

of Human Resources James Crawford ("Crawford"). ORD required a total of 9 Area Managers and 36 Region Managers.

Lindsey applied for the Washington Area Manager position, part of the Southern Zone headed by Bardis as Vice President/Zone Manager. In December 1986 (Lindsey was then 40 years old) Bardis told Lindsey that 32–year–old Henry Rossell ("Rossell") had been selected for that position. Instead Bardis offered Lindsey ORD's Washington/Baltimore Region Manager position at the same management level and pay as he was then receiving. Lindsey declined the offer but told Bardis that he wanted to remain with the company and seek another management position.

Lindsey then remained on the Baxter payroll even though his duties were minimal to nonexistent. In February 1987 he spoke with and wrote to Vice President of Corporate Sales Thomas Funkhouser ("Funkhouser") about a national sales account position. Funkhouser responded in a March 17 letter that he would not be able to offer Lindsey a position, adding (Lindsey Aff.Ex. 14):

> Steve, it would be even more regrettable if our corporation is unable to find suitable opportunities for you to pursue without relocation. Your track record should make you an attractive candidate for one of our divisions.

Just a few days later Lindsey spoke to Bardis and wrote Nelson about his interest in two open Area Manager positions. He never heard again about those two positions, each of which was ultimately filled by a man under 40.

On May 4, 1987 Lindsey received a letter memorandum from Crawford dated April 22 and stating that he had been terminated "as of February 1, 1987." That letter (*id.*

Ex. 15, a copy of which is attached to this opinion) said that Lindsey would be able to remain on the payroll through May 8, 1987 (four days later!), which was said to constitute a total of 17 weeks of severance pay.

On May 15, 1987 Lindsey filed a charge of age discrimination with the Maryland Commission on Human Relations ("Maryland Commission") and the Equal Employment Opportunity Commission ("EEOC"). Although the charge mentions only discrimination in promotions, Lindsey says that he also discussed the fact that he had been terminated with the EEOC representative who prepared the charge. In May 1988 Lindsey sent letters to the Maryland Commission and the EEOC amending his charge to include the allegation that he was "constructively terminated." Lindsey then brought this suit in December 1988.

### ADEA Violation

■ In assessing Lindsey's ADEA claim, this Court finds itself once again looking to the *McDonnell Douglas/Burdine* burden-shifting analysis [8]—a well-oiled machine whose operations have become familiar to judges and litigants alike in its handling of the ever-proliferating numbers of employment discrimination claims. Lindsey claims that both the denial of his promotion and his termination were discriminatory acts—and as to each he must be able to "danc[e] through the *McDonnell Douglas* quadrille" (*Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990)) to survive summary judgment.

### Non–Promotion

In the first stage of the *McDonnell Douglas/Burdine* test, Lindsey must establish a prima facie case of age discrimination by showing [9] four elements set out

---

**8.** Indirect evidence of age discrimination is evaluated in accordance with the ping-pong approach dictated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), and as extended to ADEA cases in *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219 (7th Cir.1980) (per curiam). This Court employs the indirect method because

any direct evidence of discrimination that Lindsey produces can be assessed—and will have the same effect—at the pretext stage of the *McDonnell Douglas/Burdine* analysis.

**9.** Although the text both here and later speaks of what Lindsey may or must "show" or "prove," any such locution must be understood in the Rule 56 context as imposing on Lindsey the materially lesser burden of demonstrating the existence of a genuine issue of material fact on

by this Court's colleague Chief Judge James B. Moran in *Racich v. National Railroad Passenger Corp.*, 47 Fair Empl. Prac. Cas. (BNA) 146, 149 (N.D.Ill.1988):

(1) that he was in the protected group, that is, age 40 to 70; (2) that he was qualified for the promotion sought; (3) that he was not promoted; and (4) that the promotion was given to a younger person.

There is no doubt that Lindsey meets three of those four elements, but the parties dispute whether Lindsey was "qualified" for the Washington Area Manager position. More accurately, Baxter argues not so much that Lindsey was not "qualified," but rather that the decisionmakers found that someone else was *more* qualified. Baxter maintains that Rossell had the specific communication-oriented qualities that it sought in an Area Manager (Kletzel Aff. ¶ 5): [10]

In evaluating the candidates for area manager, Bardis and I focused primarily on their leadership skills, professionalism, judgment, sensitivity, the ability to appropriately communicate to upper management and subordinates, and maturity.

■ But Baxter mistakes "qualified" for "best qualified." It surely cannot argue that Lindsey's performance as a Region Manager was less than outstanding. His performance evaluations consistently stated as much. He was considered in the pool of candidates for Area Manager, and Gould had recommended him highly for that position. Indeed, in the context of making out a prima facie case, it has been said that the performance criterion can be satisfied "based solely upon the employee's testimony concerning the quality of his work" (*Williams v. Williams Electronics*, 856 F.2d 920, 923 n. 6 (7th Cir.1988))—and in this instance Lindsey offers objective evidence as well as his own subjective self-evaluation. It must be held that Lindsey

was qualified for the position—even if ultimately not chosen because Baxter thought him not the *most* qualified. Lindsey has met his burden of establishing a prima facie case.

■ Arguments thus advanced by Baxter to the effect that Lindsey was not the *most* qualified are pertinent instead at the next stage of the *McDonnell Douglas/Burdine* analysis. Here the employer must show that its reasons for failing to promote were legitimate, nondiscriminatory reasons. That is a mere burden of production (*LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984)). Baxter has readily met that burden in its three reasons for its choice of Rossell over Lindsey as Area Manager (Kletzel Aff. ¶¶ 6–9): [11]

6. Several factors entered into our decision. First, Rossell had an excellent reputation and was well liked and respected by upper management and the sales representatives who worked for him. He was known as a "go getter" who worked extremely hard and was enthusiastic about the company. He also had good judgment and never put himself or others in embarrassing positions. Rossell also had good evaluations and sales results.

7. Steve Lindsey was not a candidate of the same caliber as Rossell. Lindsey, like Rossell, had good evaluations and sales results. But when it came to leadership skills, professionalism, judgment, sensitivity, communication skills, and maturity, Steve Lindsey couldn't carry Hank Rossell's lunch. From November, 1984 through June 1986 I was a vice president/zone manager of Pharmaseal and indirectly supervised Steve Lindsey who was then a region manager for Pharmaseal within my zone. I heard nu-

---

either such score. To avoid awkward repetition of the Rule 56 standard, this opinion employs the language of "proof" or "showing" simply as a surrogate for the proper standard, but this Court has of course applied the correct test.

**10.** Bardis Aff. ¶ 5 offers the identical list, changing only their order of presentation.

**11.** Again Bardis Aff. ¶¶ 6–9 reflected much the same evaluation (though in this instance Bardis Aff. ¶ 7 expanded on the factual support in Kletzel Aff. ¶ 7).

merous reports of Lindsey's sexual indiscretions with colleagues, subordinates and even customers. Lindsey also did not know how to express his criticisms of Baxter's management in an appropriate manner. For example, in 1986 it was reported to me that Lindsey had referred to a Baxter vice president as a "bitch" and berated her performance in front of a group of nonemployees. After that incident, I instructed John Bardis to counsel Lindsey that any further mistakes of this nature could mean the end of his career with Baxter.

8. Another factor favoring Rossell was his V. Mueller product knowledge. Because the ORD was a merger of four divisions selling separate product lines, one of our objectives was to have a balanced mix of product knowledge within each zone. The other two managers in the Southern Zone had Pharmaseal and Convertors backgrounds, respectively. Choosing Lindsey for the third area manager slot in that zone would have resulted in two of the area managers having Pharmaseal product backgrounds. Rossell, on the other hand, with his V. Mueller background, provided a better balance of product knowledge in that zone.

9. A third factor which entered into our decision was Rossell's willingness to move. I expected the ORD to continue to undergo reorganizations requiring managers to relocate. I understood from Bardis that while Rossell was open to relocating, Lindsey was not.

Lindsey must be able to "refute [Baxter's] specific explanations" (*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)) to clear the final hurdle of the *McDonnell Douglas/Burdine* analysis. Here Lindsey must prove that Baxter's reasons for not promoting him were pretextual, either by showing that Baxter was more likely motivated by discriminatory reasons or that the justification is unworthy of credence (*Burdine*, 450 U.S. at 253–56, 101 S.Ct. at 1093–95; *Weihaupt v. American Medical Association*, 874 F.2d 419, 428 (7th Cir.1989)). This opinion turns first to the latter alternative.

Lindsey suggests specific explanations as to why each of Baxter's three asserted rationales for choosing Rossell is unworthy of belief. First, he challenges Baxter's characterization of his behavior as less than professional or as insensitive, to the extent that it was based on the incidents cited by Bardis and Kletzel. He denies any "sexual indiscretions," he says (as discussed earlier) that he apologized for the "bitch" episode in a professional manner, and he denies any involvement in leaks of confidential information (Lindsey Aff. ¶ 9). Second, Lindsey disputes the legitimacy of the "political" concerns of balance among different divisions (*id.* ¶ 10). He characterizes Pharmaseal as comprising two distinct divisions, Surgical and Nursing, and shows that no one from Pharmaseal Surgical was appointed to be an Area Manager for ORD (*id.* ¶ 11). Finally, he denies that he was unwilling to relocate, stating that in 1985 he interviewed with Kletzel for the Area Manager position in Edison, N.J. and that he was divorced in March 1985, so there were no "domestic" problems in relocating (*id.* ¶ 6). In addition, Lindsey notes that on Rossell's August 1986 performance evaluation the Area Manager had recommended that Rossell stay in region management for the next 12 to 18 months (*id.* Ex. 6 at 5).

However true all of that may be, Baxter is entitled to believe (1) that second-hand reports of indiscretions or leaks were reliable, (2) that no apology can make up for calling a female coworker a "bitch," (3) that Pharmaseal was one division, and one that was already represented in the particular *zone*, whereas V. Mueller was not, (4) that Lindsey was unwilling to relocate in 1986 *at the time* that he applied only for the Washington Area Manager position in the new ORD and (5) that Rossell was more qualified. As *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted, brackets in original) teaches:

> [W]e do "not sit as a super-personnel department that reexamines an entity's business decisions." "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's man-

agers, [the ADEA does] not interfere." Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior."

■ If Baxter indeed was mistaken in its beliefs or was unfair in its choice of criteria—and this Court is certainly not in a position to *decide* to that effect—that is of no import to Lindsey's claim, as long as Baxter's reasons were credible. Lindsey has not been able to show that Baxter's reasons for promoting Rossell were not genuine. On that score our Court of Appeals has stated in *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1426 (7th Cir.1986) (citations omitted): [12]

> It is not the court's duty to determine the validity of the defendant's business decision as long as the decision was made in good faith. An evaluation is made in good faith if it was genuinely and honestly made in an attempt to select the employees to be retained on the basis of performance related considerations.

Furthermore, at the *pretext* stage of the analysis (unlike the initial prima facie stage) Lindsey's "own self-interested assertions concerning [his] abilities are not in themselves sufficient to raise a genuine issue of material fact" (*Williams*, 856 F.2d at 924).

■ This opinion turns then to Lindsey's claimed direct proof of age discrimination to show pretext. Here Lindsey makes two arguments. First he says that in 1985 Nelson, then Pharmaseal's Vice President of Sales, reportedly said to another manager that "as long as he was running this organization there weren't go-

ing to be any of the good old boys that were going to be promoted" (D.Mem. 8).[13] Even if that were so, there are two problems with using the statement as direct evidence of age discrimination.

One is that the colloquial term "good old boys"—unlike "old boys" alone—does not most frequently connote age as such. More typically, it refers to "a male who embodies the unsophisticated good fellowship and sometimes boisterous sociability regarded as typical of white males of small towns and rural areas of the South" or "a person who belongs to a network of friends and associates with close ties of loyalty and mutual support" (*Random House Dictionary of the English Language* 822 (2d ed. 1987); accord, Chapman, *New Dictionary of American Slang* 173 (1986)).

Relatedly, an "old boys' network" (not "old boys" alone) commonly refers simply to those in power, independently of any age-based characterization, so that the phrase is most often found in employment discrimination cases as referring to the persons who have denied promotions to groups such as racial minorities and women (see, e.g., *Ingram v. Missouri Pacific Railroad*, 897 F.2d 1450, 1455 (8th Cir.1990); *Sola v. Lafayette College*, 804 F.2d 40, 45 (3rd Cir.1986)). Hence *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir.1990) recently held squarely that a comment that certain employees were "part of an old-boy network" does not create an inference of age discrimination because the term "is generally considered a colloquialism unrelated to age." [14]

---

**12.** *Dorsch* was a reduction-in-force case, but that makes no difference (certainly not at this stage of the analysis).

**13.** Baxter's Rule 56 legal memorandum is this Court's only source of what Lindsey claims Nelson said, as well as of the claimed surrounding circumstances. Lindsey did not supply more information, and neither party supplied the pertinent pages of Lindsey's deposition. That form of presentation is really inadequate. Just as a legal memorandum cannot take the place of pleading allegations for purposes of a Rule 12(b)(6) evaluation (*Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989) and *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th

Cir.1984)), so such a memorandum cannot meet the Rule 56(e) requirement of admissible *evidence*—indeed, that really follows a fortiori. This opinion credits the assertion as to Nelson's comment only to avoid another procedural step, in which Lindsey's counsel would presumably cure the deficiency by citing to a proper evidentiary source.

**14.** That age-neutral usage jibes totally with the definition of "good old boy" in Green, *Dictionary of Contemporary Slang* 119 (1984):

> a Southern man of any age who conforms to the prevalent cultural standards.

To return to the particular locution ascribed to Nelson—"good old boys"—Lindsey himself admitted to never having heard the term before and as to "hav[ing] no idea what the comment means" (Lindsey Dep. 143), so that Lindsey "himself did not understand [Nelson's] statement to evince an intent to discriminate" against him because of his age (*Montgomery v. Campbell Soup Co.*, 647 F.Supp. 1372, 1380 (N.D.Ill.1986)). Without some showing to support the inference that Nelson intended the comment to refer to age, this Court agrees with the authorities already cited that the phrase "good old boys" as it is commonly used and understood is not evidence of age discrimination.

■■■ But even if the matter were to be stretched to draw an inference of discrimination on Nelson's part, Lindsey must lose on the issue because Nelson was not the person who decided not to promote Lindsey. Only evidence probative of the actual decisionmaker's motives is relevant (*LaMontagne*, 750 F.2d at 1412). In late November or early December 1986 Nelson instructed Kletzel to meet with the three Zone Managers—Bardis, Carl Gatewood and Jack Hersma—for the purpose of choosing the Area and Region Managers for ORD. Kletzel held that meeting in early December, and each of the Zone Managers—in conjunction with Kletzel himself—was responsible for choosing the Area and Region Managers within his zone. Hence Kletzel and Bardis were responsible for deciding who would be promoted to the Area Manager position in ORD's Washington office. True enough, that decision was subject to the approval of Nelson and Crawford. But Nelson was provided not with the names of all the candidates but only with the name of the one person selected for each position—in this instance Rossell (Kletzel Aff. ¶ 3; Nelson Aff. ¶ 3). Lindsey provides no evidence that Nelson was responsible for anything other than deciding whether Rossell "could do the job" (*id.*). Nor is there anything to suggest any type of reverse feedback, under which Nelson might have improperly influenced the decisions of the persons who were directly responsible for recommending promotions for some applicants and hence for denying promotions to the group of unsuccessful applicants.

■■■ Lindsay has essayed a second attempt to show direct proof of age discrimination: one based on statistics. In that respect Lindsey points to the facts that (P. 12(n) ¶¶ 1–3): [15]

1. In 1984 six persons were promoted to the Region, Area and Zone Manager positions, only one of whom was over 40.

2. In 1985 there were 11 persons promoted to Region, Area and Zone Manager positions, none of whom was over 40.

3. In 1987 there were 30 persons promoted to Region, Area and Zone manager positions, two of whom were over 40.

There is of course a somewhat greater problem in ascribing material probative value to statistical evidence in dealing with claims of disparate *treatment* of an individual than in dealing with disparate *impact* claims—where such statistics are unquestionably relevant. But wholly apart from that general level of difficulty, Lindsey's statistics suffer from more specific problems. For instance, the only statistics that are potentially relevant here are those relating to the Area Manager positions rather than to the entire managerial ranks. As *Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977) pointed out:

When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

Progressively higher ranking positions (such as Region, Area and Zone Manager) typically require increasingly greater, if

---

**15.** Although their submissions have cited incorrectly to the subparagraphs of this District Court's General Rule 12(m) and 12(n), which require factual statements in support of and in opposition to Rule 56 motions, both sides have in fact tendered such statements (cited "D. 12(m)—" and "P. 12(n)—" respectively).

not different, qualifications. There is no evidence in this case that promotion to Area Manager is virtually guaranteed after a certain number of years as Region Manager. Instead those chosen for higher positions were selected from among a pool of candidates based upon the specific qualifications of the respective candidates. Lindsey must focus his analysis on the pool of candidates applying for Area Manager positions.

But Lindsey simply does not describe (or even address) that pool. As *Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254, 1258 (7th Cir.1987) put it:

> [W]e are dubious of statistical evidence of hiring which fails to account for the applicant pool.

And that identical concern was reiterated in *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th Cir.1989) (citations and footnote, as well as a quotation from *Kier*, omitted), where aggrieved employee Smith had produced comparable statistics:

> Further, the fact that only nine of the 106 new hires [in a particular year] were over 40 tells us nothing, since Smith omitted vital information regarding the pool of applicants and whether qualified older employees were available or even applied for those jobs. In the absence of evidence regarding the qualified potential applicants from the relevant labor market, we find Smith's statistics fail in any way to show discrimination.[16]

That same conclusion is called for here, where Lindsey has not at all described the pool of candidates applying for the Area Manager positions. But Baxter has: It explains that the candidate pool from which Area Managers for ORD were chosen comprised the Region Managers of the four divisions that merged to form ORD. In 1986 approximately 80% of that group was under 40 (Vice President of Human Resources Peter Warenski Aff. ¶ 2), and the

corresponding figure in 1987 was approximately 85% (*id.*). Because the position of Region Manager is an entry-level management position (Kletzel Aff. ¶ 11):

> Those who were interested in becoming region managers were primarily younger sales representatives who wanted to begin a management career with the company. The older sales reps generally had a big book of business, established clientele, and large commission incomes. many of them made two to three times the salaries of region managers and even area managers. Thus, older reps were not "beating down the door" to become region managers.

In confirmation of that statement, it is noteworthy that Lindsey himself took a large cut in pay (from $84,000 to $38,000, Lindsey Dep. 48) to pursue an opportunity in management. Therefore the fact that the pool of candidates for Area Manager was predominantly under 40 does not itself raise an inference of age discrimination.

As for any more relevant statistics that bear solely on promotions to Area Manager, it does appear that of the nine Area Manager positions created by ORD just one was filled by an individual over 40 (P.Mem. 5).[17] But any effort to extrapolate a conclusion from such scant evidence is precluded by the principle announced in *Parker v. Federal National Mortgage Association*, 741 F.2d 975 (7th Cir.1984). There the court held that, where the employee offered numbers showing that out of a total pool of 12 employees, three of the four terminated were in the protected age group (*id.* at 980–81) (citation omitted):

> The trouble with Parker's statistical evidence is that it lacks sufficient breadth to be trustworthy. A small change in the underlying raw data would result in dramatic statistical fluctuations. The small sample size employed by Parker as well as the selective manner of charac-

---

16. [Footnote by this Court] *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), which dealt with the use of statistics in disparate impact cases (where the environment has been more hospitable to such evidence than in disparate treatment cases), really underscores the point made in the text.

17. That individual was also the only one who had been promoted to an Area Manager position during the preceding four-year period.

terization prevent Parker's "statistical evidence" from giving rise to a reasonable inference of discriminatory motive.

Indeed, massaging the numbers that are relevant in this case, Baxter demonstrates that because 80 to 85% of the applicant pool of Region Managers from which the Area Managers was drawn were persons under 40, the fact that one person out of nine chosen for a promotion to Area Manager was over 40 was a statistically permissible result (within two standard deviations from the expected mean, see D.Mem. App.B).[18] Without considerably more grist for the mill, it can scarcely be said that promotions from within a group of entry-level people (who are quite understandably likely to be a younger set of employees) are somehow age discriminatory just because a high percentage of those chosen from among the group are also younger—below age 40.

One thing is certainly clear from all this: Lindsey's tendered statistics do not reasonably support an inference of discrimination. Thus his other attempt at direct proof of an age discriminatory decision by Baxter fails.

\*　\*　\*　\*　\*　\*

In sum, Lindsey has not created a genuine issue of material fact as to his claim that he was denied a promotion because of his age. Neither the indirect nor the direct method of proof arguably suggests such a conclusion.

### Termination

Before this Court may reach the question whether Lindsey can survive summary judgment on his claim that he was terminated because of his age, it must address Baxter's argument that the termination claim is time-barred. Lindsey's initial EEOC charge (Complaint Ex. 6)—which mentioned only Baxter's failure to promote him—was dated May 15, 1987, thus complying with the ADEA provision that a charge must be filed "within 300 days after the alleged unlawful practice occurred" (29 U.S.C. § 626(d)(2)). Just over a year later (on May 24, 1988) Lindsey wrote a letter to EEOC (Complaint Ex. 8) amending his charge to include a charge of "constructive termination."

Baxter invokes the principle that an employee's ADEA complaint cannot contain claims not "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations" (*Steffen v. Meridian Life Insurance Co.*, 859 F.2d 534, 544 (7th Cir.1988), quoting earlier cases). That is so because "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge" (*Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir.1985)).

But those cases do not deal with an amended charge such as that involved here. Baxter overlooks the relevant EEOC regulation, 29 C.F.R. § 1626.8(c):

A charge may be amended to clarify or amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful

---

**18.** This of course is somewhat of an oversimplification—more accurately, two standard deviations simply measure the watershed for approximately a 95% level of confidence in (or on the obverse side of the coin, a 5% level of disparity from) what might be expected in a random distribution (see Hoel, *Elementary Statistics* §§ 4.2–4.3 (4th ed. 1976)). What has happened in the judicial arena is that the two-standard-deviation figure has gained a special degree of credibility since its appearance in a Supreme Court opinion (*Castaneda v. Partida,* 430 U.S. 482, 496 n. 17 at 497, 97 S.Ct. 1272, 1281 n. 17 at 1281, 51 L.Ed.2d 498 (1977) (emphasis added)):

As a general rule for such large samples, if the difference between the expected value and the observed number is *greater than two or three standard deviations,* then the hypothesis that the jury drawing was random would be suspect to a social scientist.

That *Castaneda* footnote language was then repeated in *Hazelwood School District,* 433 U.S. at 308 n. 14, 97 S.Ct. at 1280 n. 14. For a more extensive treatment of the calculation of statistical significance and its role in disparate treatment cases, see *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 645–48 (4th Cir. 1983). Finally on the subject of statistics, here Baxter buttresses its two-standard-deviations argument with the use of the more sophisticated chi-square distribution (see Hoel ch. 10). Suffice it to say that Lindsey's statistically-based argument, though possessing some superficial attractiveness, does not survive analysis.

employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

In this instance Lindsey's May 24, 1988 letter amendment stated:

As a direct consequence of the failure of Baxter to promote me, I was constructively terminated from my employment.

That clearly "alleg[es] additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge."

Because the amended charge thus relates back to the original charge, Lindsey's charge of constructive termination was timely filed with EEOC.[19] In addition, because Lindsey's amendment came a full six months before he filed his complaint here, it cannot be said that he was trying either to circumvent an investigation by EEOC or to deprive the employer of notice of the charge, as happens when a claim appears for the first time in the complaint (see *Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 128 (7th Cir.1989) (plaintiffs' filing of additional charges with EEOC five days before they filed their complaint was an unsuccessful attempt to circumvent the EEOC charge-filing requirement and avoid giving notice to defendant)).

At this point Baxter will be treated as having terminated Lindsey (an issue discussed in the next section of this opinion).[20] Even so, his termination-based ADEA claim suffers from the same problems as did his denial-of-promotion claim. Because Lindsey alleges that his termination followed from the same set of circumstances that led to the denial of a promotion, he has not raised a genuine issue of material fact that he was terminated because of his age.

### Breach of Employment Contract

Lindsey claims that Baxter owed him severance pay that he did not receive upon his termination in May 1987. If that date were used as a trigger for determining benefits, he must lose that argument. Baxter's policy as to severance pay and benefits that became effective March 11, 1987 (the "March 1987 Policy," Crawford Aff.Ex. 1) stated explicitly:

Severance pay and benefits will not be allowed under the following circumstances:

\* \* \* \* \* \*

d. Refusal to accept offer of a comparable position within the Company. Comparable position is defined as one entailing no significant reduction in job content and value, compensation or relocation.

Because Lindsey had refused to take the position of Washington/Baltimore Region Manager for ORD at the same compensation and benefits, Baxter correctly asserts that he would not have been entitled to severance pay under the March 1987 Policy.

However, the March 1987 Policy would apply only if Lindsey were indeed terminated in May 1987—a matter discussed in a moment. But before that subject is addressed, a word should be said about Baxter's alternative contention that Lindsey resigned when he refused the offer of Region Manager in December 1986,

---

**19.** There is no evidence that EEOC actually received the amended charge, but this Court does not dwell on that because Lindsey receives the benefit of the doubt on summary judgment and because he cannot win the issue in any event.

**20.** Lindsey's letter reference to his having been "constructively terminated" is both mysterious and untenable. As for the former (mysteriousness), the concept of "constructive" termination refers to an *employee's* election to depart from the workplace for reasons that he or she ascribes to the employer's having made life miserable for the employee—as *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986)

(emphasis in *Bartman,* citations omitted) states the test:

An employer constructively discharges an employee only if it *"makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation...."

And as for the latter (untenability), it would be hard to fashion a set of facts more at odds with the *Bartman* concept than what happened to Lindsey. Indeed, Lindsey himself must have realized that, for both his Complaint and his Rule 56 memorandum speak only of his "termination," without the wholly inapt modifier of its having been "constructive."

at a time when Baxter's policy that had taken effect July 1, 1985 (the "July 1985 Policy," Crawford Aff.Ex. 2) did not allow severance pay for voluntary termination. That argument simply does not hold water, not only because it is controverted by Lindsey[21] but because it is directly contradicted by Baxter's own conduct in retaining him, and then in sending the termination letter in the form it did.

That last reference—Baxter's own conduct—points the way to resolution of the issue.[22] Baxter cannot escape its own contemporaneous characterization of Lindsey's termination and must be held bound by it. As already mentioned, Crawford's April 22, 1987 letter to Lindsey began by stating (Lindsey Aff.Ex. 15, attached to this opinion):

> As a result of the recent Company reorganization, it has become necessary to terminate your employment with Baxter Travenol as of February 1, 1987.

That brings Lindsey's situation squarely within the provision of the July 1985 Policy that mandates the payment of severance pay to an employee "involuntarily terminated for performance or operational reasons":[23]

> Involuntary termination due to operational reasons (Operational Termination) means that the Employee is terminated by the Company due to the elimination of the Employee's job, a reorganization, a technological change, a sale or closing of a plant or facility, or a Company-wide or Affiliate-wide work force reduction.

As an "involuntarily terminated" employee under Baxter's own characterization, Lindsey was entitled to receive severance pay as a matter of right. And Crawford's April 1987 letter says as much—it cannot

be distorted into a characterization of the severance pay as a "gift" in recognition of his years of service, as Baxter's unconscionable effort at revisionist history (D.Mem. 15) would now seek to do.

It is of course somewhat odd to find a letter such as Crawford's speaking of a termination "as of" nearly three months earlier. But there is a wholly understandable reason for what happened in that respect. Bardis had told Lindsey that he could stay on the payroll to seek another position (Bardis Aff. ¶ 10). In January 1987 Lindsey worked two to four days a week helping in the transition, but by February he was doing "[n]othing much" (Lindsey Dep. 107). In late March or early April Crawford discovered that Lindsey was still on the payroll although essentially doing nothing, so he instructed Bardis at that time to inform Lindsey "he is no longer to be an active employee" (Crawford Dep. 107).

If Baxter made a later-perceived mistake by keeping Lindsey on the payroll after December 1986, who should bear the consequences? To answer that Lindsey must do so would defeat the entire purpose of an employee's right to severance pay and—at least as importantly—would war directly with Baxter's own treatment of the matter. Crawford accurately said in his April 22, 1987 letter that the purpose of such pay was "to provide you with financial assistance during this period of transition." But when Crawford then proceeded to calculate the severance pay by labeling Lindsey's termination date was February 1 and by counting his already-paid compensation after that date as "severance pay," he effectively killed any "transition" period. De-

---

21. Lindsey denies ever having said that he was resigning. Instead he told Bardis that he wanted to stay with the corporation (Lindsey Dep. 96–97).

22. As stated at the outset of this opinion, Lindsey did not counter Baxter's Rule 56 motion with one of his own. Normally that would result only in the denial of Baxter's motion, with the claim remaining for disposition via trial. But in this instance the facts tendered by the parties are really not in dispute, and they call not only for denial of Baxter's own motion

but for a ruling against Baxter on the merits of the claim as a matter of law (see discussion in 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720, at 28–34 and especially 30 n. 20 and cases cited (2d ed. 1983)).

23. It should also be noted that the July 1985 Policy did not have a provision like that in the March 1987 Policy disallowing severance pay for a "refusal to accept offer of a comparable position."

spite the April 17 date of the letter, Lindsey did not receive it until May 4, and he was forced to leave Baxter on May 8 with no further severance pay. Needless to say, Lindsey had no opportunity to use the severance pay as he best saw fit, nor was he given any chance to take advantage of the provisions in Crawford's letter giving Lindsey what was called a "Salary Continuation" (!) option—one of staying on the payroll—or the "elect[ion] to receive your severance in a lump sum payout" (!!). By designating Lindsey's termination date as February 1, 1987 and by giving Lindsey such a belated retrospective notice, Baxter rendered Lindsey unable to make any decision to cut his losses, receive a lump sum payment and pursue a paying position elsewhere.[24]

It is surely appropriate on the facts here to accept Baxter's own date of February 1, 1987 as Lindsey's termination date: That ties in not only with Crawford's own letter specification but also with Crawford's own testimony as to why he decided on Lindsey's termination. Under Baxter's own choice of termination date, its July 1985 Policy applies. And under that policy Lindsey is entitled to severance pay. Baxter cannot escape its obligation by creating an artificial hindsight construct that Lindsey's compensation after February 1 was really "severance pay." Lindsey is entitled to his full severance pay as a matter of law.

### Conclusion

No genuine issue of material fact exists as to Lindsey's claims that he was denied a promotion and was terminated in violation of the ADEA. Baxter is therefore entitled to judgment as a matter of law on those counts. They are dismissed with prejudice.

Nor is there any genuine issue of material fact as to Lindsey's right to severance pay, but that claim must be resolved in favor of Lindsey rather than Baxter. Accordingly Baxter is ordered to pay Lindsey the severance pay of $15,512.54 as calculated in Crawford's April 22, 1987 letter. Judgment is ordered to be entered in favor of Lindsey and against Baxter in that amount.[25]

---

**24.** Indeed, it takes no imagination to recognize, both from the form and the content of Crawford's letter memorandum, that it was not a document personalized for Lindsey—too many of its provisions, such as those just reviewed, were truly bizarre as applied to him. Instead the memorandum plainly appears to be a general form employed by Baxter for its employee terminations that were occasioned "[a]s a result of the recent Company reorganization," with the various individualized items (date of termination, amount of severance pay and unused vacation, severance date if the employee chose the salary continuation option) having been plugged into the blanks based on Lindsey's own situation.

**25.** This assumes that Lindsey has already been paid the $4,392 in vacation pay to which he was entitled. It also makes no deduction for the few days that elapsed between the May 4, 1987 date of delivery of the letter to Lindsey and his date of departure, a span of time that might arguably qualify technically as a "salary continuation" period but (given its de minimis nature) really did not reflect an effective exercise of such an option on Lindsey's part.